**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

JOSEPH LABARBERA,

Plaintiff,

-against-

THE CITY OF NEW YORK, JOSEPH SCHIAVO, *In his official and individual capacities*, and GUY FERRARO, *In his official and individual capacities,*

Defendants.

------------------------------------------------------------------X

Case No.: 1:26-cv-5941

**COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Plaintiff, JOSEPH LABARBERA, by and through his attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the Defendants as follows:

**NATURE OF THE CASE**

1. Plaintiff complains pursuant to The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"); the New York State Human Rights Law, New York State Executive Law § 296, *et. seq.* ("NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code § 8-107, *et. seq.* ("NYCHRL"), and seeks damages to redress the injuries he has suffered for disability discrimination, hostile work environment, retaliation, failure to provide reasonable accommodation, and failure to engage in a good-faith interactive process and cooperative dialogue based on Plaintiff's actual and/or perceived disabilities, including **Ulcerative Colitis, Rheumatoid Arthritis, and Atrial Septal Defect**.

**JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES**

2. Jurisdiction of this Court is proper under 42 U.S.C. § 12101, *et seq.*, and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

5. By: (a) timely filing a Notice of Claim against Defendant THE CITY OF NEW YORK on September 12, 2025 with the New York City Comptroller, less than 90 days after the last act of discrimination against Plaintiff; (b) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 7, 2025; (c) receiving a Notice of Right to Sue from the EEOC on June 26, 2026; and (d) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action.

6. A copy of the Notice of Claim and Notice of Right to Sue are annexed hereto as **Exhibits A and B, respectively**.

## PARTIES

7. At all times relevant hereto, Plaintiff JOSEPH LABARBERA ("Plaintiff") is a resident of the State of New York.

8. At all times relevant hereto, Defendant THE CITY OF NEW YORK, acting through its Department of Transportation ("NYC DOT"), employed Plaintiff.

9. Upon information and belief, NYC DOT employs fifteen or more employees.

10. At all times material, NYC DOT was and is Plaintiff's employer, in that Plaintiff was hired to work at its 6080 Flatlands Avenue, Brooklyn, New York 11236 location (the "58th Street Yard") as an "Assistant City Highway Repairer" ("ACHR").

11. At all times relevant hereto, Defendant JOSEPH SCHIAVO ("Defendant SCHIAVO") was and is employed as a "District Supervisor" for NYC DOT, and had supervisory authority over Plaintiff. Defendant SCHIAVO had the authority, including authority over Plaintiff's assignments, worksite location, and to hire, fire, or affect the terms and conditions of

Plaintiff's employment, or to otherwise influence the decisionmaker of the same. He also had the power to determine Plaintiff's worksite locations.

12. At all times relevant hereto, Defendant GUY FERRARO ("Defendant FERRARO") was and is employed as a "District Supervisor" for NYC DOT, and similarly had supervisory authority over Plaintiff. Defendant FERRARO had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same. He also had the power to determine Plaintiff's worksite locations.

13. Defendants SCHIAVO and FERRARO shall be referred to collectively as "Individual Defendants".

14. Defendants THE CITY OF NEW YORK, SCHIAVO, and FERRARO are collectively referred to herein as "Collective Defendants".

**MATERIAL FACTS**

15. On or about May 15, 2022, Plaintiff was hired by Defendants as a seasonal "Assistant City Highway Repairer" ("ACHR") at NYC DOT's Brooklyn location at 6080 Flatlands Avenue, Brooklyn, New York 11236 (the "58th Street Yard").

16. As an ACHR, Plaintiff was responsible for repairing and maintaining New York City roads, which included paving, shoveling, raking, driving work vehicles, milling roads, and filling in potholes.

17. Upon information and belief, the working season for each year begins in March and ends in December.

18. As such, Plaintiff earned approximately twenty-nine dollars ($29.00) an hour, and worked approximately over forty (40) hours a week from March to December, earning approximately $44,000 per year.

19. At all times relevant, Plaintiff had been diagnosed and suffered from Atrial Septal Defect, Ulcerative Colitis, and Rheumatoid Arthritis.

20. Atrial Septal Defect ("ASD") is a congenital heart defect that is present at birth. Ulcerative Colitis ("UC") is a chronic autoimmune inflammatory bowel disease that causes inflammation and ulcers in the colon and rectum. Rheumatoid Arthritis ("RA") is a chronic autoimmune disease that causes inflammation, pain, and stiffness in the joints. These conditions substantially limited Plaintiff's major life activities, including bowel function, working, traveling, commuting, and performing daily activities.

21. In or around May 2022, Plaintiff apprised NYC DOT of his conditions when he was first hired, and was being treated for them with medication.

22. Plaintiff's performance has been exemplary during the course of his employment with Collective Defendants. Plaintiff performed his job successfully and, upon information and belief, had no discipline or negative performance reviews during his employment.

23. About two months after Plaintiff was hired, Plaintiff began experiencing increased symptoms due to his UC and RA conditions. Notably, the symptoms and flareups caused Plaintiff to experience uncontrolled bowel movements and severe and chronic pain.

24. As such, in or around July 2022, Plaintiff went to his District Supervisor, Defendant FERRARO, to inform him of Plaintiff's UC condition. Specifically, Plaintiff stated that UC makes it so that he has to go to the bathroom a lot more, and asked if he could use his personal car instead of a work truck so that he could more easily find parking to get to a bathroom and would not have to worry about accidentally defecating in the company vehicle.

25. Defendant FERRARO'S response was, *"You know, I wouldn't let nobody else know this. You're lucky you have me as your boss, because anybody else would just put you on a truck right now and tell you to shit your pants all over the place."*

26. Despite Plaintiff's request for accommodation, Defendant FERRARO forced Plaintiff to drive a company truck two days later.

27. Despite knowing about Plaintiff's anxiety which stemmed from his disabilities, Defendant FERRARO would taunt and humiliate Plaintiff in front of co-workers by jiggling the truck keys in front of him, then force Plaintiff to drive the company trucks.

28. Other coworkers witnessed the harassment and joined in on the hazing.

29. Plaintiff was repeatedly harassed and given derogatory and belittling nicknames such as "Diaper Boy" and "Shitty Pants". His coworkers would even say, *"Don't give [Plaintiff] coffee"* and laugh, referring to the crude nicknames that they also called Plaintiff.

30. A few weeks after Plaintiff's accommodation request, Plaintiff again tried to speak with Defendant FERRARO about granting Plaintiff's accommodation to drive his personal car to job sites in lieu of the company truck. Plaintiff reiterated that although he was working with his doctors to try and get his disabilities back under his control, he was feeling more anxious, embarrassed, humiliated, and desperate to find a working solution for his bowel emergencies.

31. However, Defendant FERRARO dismissed Plaintiff's plea and concerns and simply said, *"My hands are tied. I have a business to run."*

32. During the entirety of Plaintiff's first season working with Defendants during 2022, Plaintiff was repeatedly mocked by Defendant FERRARO and encouraged others to do the same.

33. At some point in time, Defendant FERRARO told Defendant SCHIAVO, another District Supervisor, about Plaintiff's disabilities. Instead of assisting Plaintiff, Defendant SCHIAVO also joined in on the harassment and bullying, which ramped up during Plaintiff's second season in 2023.

34. In or around March 2023, during the first week of Plaintiff's second season of working with NYC DOT, Plaintiff was assigned to pot hole duty with one of the paving groups ("Paving One Group").

35. Throughout Plaintiff's time during that season in the Paving One Group, Plaintiff's disabilities and physical condition became worse. This prompted a significant increase in the mockery that Plaintiff experienced.

36. Defendant SCHIAVO would make comments such as, *"Don't worry about the bathroom, grab a cup of coffee," "None of that anxiety about driving the truck with me. There's a new Sheriff in town,"* and *"Don't give me that bullshit about anxiety or your stomach. You'll do as I say. Remember, this isn't a real job."*

37. Additionally, Plaintiff's coworkers would make insulting comments and jokes about Plaintiff's UC and ASD, which included calling Plaintiff a "pussy," "drama queen," "worry wort," and "baby."

38. When Plaintiff protested the treatment and stated that his disabilities are life-threatening issues that were severely affecting his mental health, he was dismissed and told by his coworkers, *"Yeah, you're fine."*

39. Collective Defendants were fully aware of the treatment that Plaintiff was receiving and did nothing to prevent it. In fact, Collective Defendants condoned, encouraged, and were complicit in said treatment.

40. In or around 2024, during Plaintiff's third season working with NYC DOT, Plaintiff noticed that the commute was taking a toll on his stomach much more than usual. Instead of going to the bathroom 3-4 times in the morning prior to arriving at work, his restroom breaks had increased to 5-7 times.

41. This required more stops during Plaintiff's already long commute, and so Plaintiff had no choice but to request a transfer to a work site closer to his home.

42. On or around March 20, 2024, Plaintiff went to Defendant SCHIAVO to put in his transfer request to another NYC DOT location at 5 Dubois Avenue, Staten Island, New York 10310 ("Dubois Avenue Yard location") or the Glen Street Yard location (at 10 Glen Street), which were closer to Plaintiff's residence.

43. Initially, Plaintiff's written reason for the transfer was regarding his concerns for his health and need for accommodations.

44. However, Defendant SCHIAVO said, *"I love how you new guys who have a year on the job want to put transfers in,"* and had Plaintiff redo the transfer paperwork to change the reason to *"learn different aspects of the company to seek growth."*

45. Plaintiff, fearing the loss of his job and wanting to stay in his superior's good graces, begrudgingly agreed to the change.

46. As Plaintiff waited for a response to his transfer request, Plaintiff's working environment became increasingly hostile as his symptoms became worse.

47. Plaintiff's coworkers continually disparaged him by calling Plaintiff "pussy," "weak," "hypochondriac," "overly dramatic," "baby," "whiner," and "chronic complainer." If there was work that Plaintiff could not do on a job site, his coworkers would make fun of him and state in fake baby voices, *"What, is it the heart palpitations today or the stomach? Grow thicker skin."*

48. At the end of the work season, on or about November 18, 2024, after not receiving any response or decision on his first transfer request, Plaintiff went to Defendant FERRARO instead of Defendant SCHIAVO to submit a second transfer request. Again, Plaintiff detailed the reason for his transfer request was due to his health and need for accommodations.

49. However, Defendant FERRARO stated, *"I wouldn't put a hardship in because, even if you get the hardship transfer, they will just put you back in Brooklyn in a few months."* Defendant FERRARO further stated that a regular transfer *"would put [Plaintiff] in a better position to not go back to Brooklyn. It doesn't look good putting down a disability as it could jeopardize your job."*

50. Again, Plaintiff was talked out of putting his disabilities and need for accommodations as the main reason for the transfer. Instead, Plaintiff put a secondary reason that "[i]t would make it easier to be closer to home because parents are not in good health and for [Plaintiff's] high risk pregnant wife."

51. While the reason was still true, Plaintiff was upset that his hardship transfer request was not being given the due attention and priority that it required.

52. On or about February 14, 2025, Plaintiff reached out to NYC DOT's Office of EEO, Diversity & Inclusion ("EDI") to inquire about the status of his second transfer request. The response that Plaintiff received from EDI was that he had to complete a "Reasonable Accommodation Request form," which was different than the transfer requests that he had previously filled out with Defendants SCHIAVO and FERRARO. As such, Plaintiff submitted the initial paperwork and corresponding documents on or about February 20, 2025.

53. Shortly thereafter, on or about March 10, 2025, Plaintiff went on paid paternity leave.

54. On or about March 21, 2025, Plaintiff received a transfer denial which stated that NYC DOT could not accommodate his request due to multiple factors, including "available space, yard recommendations, seniority, attendance, supervisor recommendations, as well as performance evaluations."

55. Plaintiff, exhausted by the treatment that he had endured up to that point, finally reached out to NYC DOT's Human Resource Department to request paperwork for a hardship transfer, on or about April 7, 2025. Plaintiff then submitted a formal hardship transfer/reasonable accommodation request and medical documentation on or about April 10, 2025.

56. Between April 22, 2025 and June 19, 2025, Plaintiff was in communication by email and phone with the EEO Investigator, Saba Maher ("Ms. Maher"), who was assigned to his accommodation request.

57. On or about May 20, 2025, Plaintiff advised EDI that, because he was unable to commute safely due to the medical issues underlying his accommodation request, he might need to take unpaid sick leave while the request was pending, and asked whether doing so would interfere with the accommodation process. Plaintiff did not receive a meaningful response to that question.

58. During this process, Ms. Maher offered demeaning "solutions," such as, *"Wear extra diapers. Bring extra clothing. And try to find a hidden garbage can to avoid ridicule."* Plaintiff also advised Ms. Maher on the harassment and mistreatment that he received by Collective Defendants, to which Ms. Maher simply stated that she sympathized with his situation.

59. These statements humiliated Plaintiff, acknowledged the foreseeable ridicule he faced at work, and did not address the accommodation he had requested.

60. However, on or about June 19, 2025, Ms. Maher spoke to Plaintiff on a phone call and stated that Plaintiff's hardship transfer request was once again denied *"because there are no open spots in Staten Island and because Staten Island is a desired work location."*

61. At one point, Ms. Maher did ask Plaintiff if he was open to working in a different location in Staten Island, to which Plaintiff agreed would be beneficial.

62. Ms. Maher did not provide Plaintiff with an effective accommodation or a final resolution of his transfer request at that time.

63. Thereafter, on or about August 1, 2025, Plaintiff received a call from a new EEO Investigator, Angela Ball ("Ms. Ball"), who has since been assigned to his matter.

64. During the call, Ms. Ball offered Plaintiff a position or transfer in Manhattan and suggested that Plaintiff commute by train and ferry, despite Plaintiff's documented need to avoid long commutes without reliable restroom access.

65. Plaintiff once again reiterated why the new location would not be an actual accommodation. Specifically, Plaintiff mentioned that the commute would not only be longer for him, but in the event of an accident, he would have nowhere to go on the train since there are no bathrooms. Plaintiff stressed that he needed to be placed in a location that is in the borough where he lived to avoid these complications.

66. Ms. Ball stated that she would check for other locations in Staten Island to see if there were any open spots or available positions.

67. Plaintiff's treating gastroenterologist, Dr. Hudesman, confirmed on September 24, 2025 that Plaintiff has been treated for UC since July 6, 2020, was diagnosed on May 18, 2020, and continues to experience urgent and frequent bowel movements that can affect daily activities, including traveling to work.

68. Dr. Hudesman recommended medical accommodations, including excused absences or leave from October 31, 2025 through April 30, 2026, and stated that with reasonable workplace accommodations, Plaintiff could continue to work.

69. NYC DOT approved Plaintiff's sick leave extension from October 31, 2025 through April 30, 2026, and told him he would need reinstatement and medical clearance before returning to work.

70. On or about February 24, 2026, NYC DOT denied Plaintiff's reasonable accommodation request, identifying the request as disability-based and stating the denial reason as: "Rejected an alternative accommodation that would meet their need and no other available." NYC DOT identified the request as disability-based and did not deny that the request related to a disability, that documentation was adequate, or that the accommodation would remove an essential job function or impose an undue hardship.

71. On May 21, 2026, Plaintiff's treating gastroenterologist Dr. Hudesman again requested a Staten Island work-location accommodation because Plaintiff's UC causes frequent and urgent bowel movements, long-distance travel increases the likelihood of flare-ups and potentially severe health consequences, and Staten Island placement would allow him to perform his duties while maintaining his health.

72. On May 29, 2026, NYC DOT issued a Notice of Intended Action stating that Plaintiff had been on medical leave for one year or more and that he would be terminated if he did not submit documentation by June 10, 2026 showing fitness to return as an Assistant City Highway Repairer.

73. On June 23, 2026, NYC DOT EDI first identified a possible Staten Island placement for Plaintiff at Staten Island Street Maintenance, Dubois Yard, located at 5 Dubois Avenue, Staten Island, New York 10301, with a 7:00 a.m. to 3:30 p.m. shift. NYC DOT described

the role as an ACHR/Street Maintenance assignment involving resurfacing city-owned streets, repairing potholes, addressing roadway defects, shoveling, raking, sweeping asphalt or debris, carrying safety equipment, operating heavy-duty equipment, traveling between field locations, and providing pedestrian and vehicular traffic support.

74. On August 24, 2026, DOT confirmed through EDI that an ACHR position was currently available in Staten Island and that the assignment would meet Plaintiff's requested reasonable accommodation: assignment to a Staten Island work location because it would allow Plaintiff to manage his disability symptoms effectively while minimizing the risk of health complications related to long commutes.

75. NYC DOT identified the assignment as Staten Island Street Maintenance, Dubois Yard, located at 5 Dubois Avenue, Staten Island, New York 10301, with a 7:00 a.m. to 3:30 p.m. shift. NYC DOT further stated that its General Counsel was aware the position had been offered to Plaintiff in response to his reasonable accommodation request.

76. Defendants' repeated delays, denials, and ineffective proposed alternatives demonstrate that Defendants did not make a timely, good-faith effort to accommodate Plaintiff's disabilities.

77. NYC DOT's offer came only after Plaintiff had spent more than one year seeking an effective accommodation, submitting medical documentation, communicating with EDI and HR, remaining out of work or on unpaid leave, facing threatened termination, and being required to resubmit a reasonable accommodation request after his earlier request and appeal had been denied.

78. The belated offer of the Staten Island ACHR position supports Plaintiff's allegation that an effective Staten Island-based accommodation was available and feasible, and that

Defendants could have provided a timely accommodation earlier, before subjecting Plaintiff to more than a year of hardship.

79. Plaintiff, through counsel, declined to return to that position because the offer did not cure the harm already caused by Defendants' prior refusal to provide an effective accommodation, failure to engage in a timely and good-faith interactive process and cooperative dialogue, lost income, lost benefits, emotional distress, and disruption to Plaintiff's employment.

80. Because Defendants failed to provide an effective accommodation in a timely manner, Plaintiff was forced to remain out of work or on unpaid leave, repeatedly seek clarification regarding his employment status, submit additional medical documentation, and face threatened termination before Defendants finally offered him a path back to work.

81. Collective Defendants failed to engage in a timely, good-faith interactive process and cooperative dialogue.

82. Collective Defendants discriminated against and harassed Plaintiff because of his actual and/or perceived disabilities (Atrial Septal Defect, Ulcerative Colitis, and Rheumatoid Arthritis).

83. But for the fact that Plaintiff has actual and/or perceived disabilities, Collective Defendants would not have treated Plaintiff differently.

84. Collective Defendants created a hostile working environment, which unreasonably interfered with Plaintiff's work environment.

85. As a result of Collective Defendants' actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

86. As a result of the acts and conduct complained of herein, Plaintiff has suffered the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such

employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

87. As Collective Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against the Collective Defendants.

**AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT**
**(Against Defendant City of New York)**

88. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

89. The Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12112 "Discrimination" states:

> "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

90. City of New York engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his actual and/or perceived disability **(Atrial Septal Defect, Ulcerative Colitis, and Rheumatoid Arthritis)**.

**AS A SECOND CAUSE OF ACTION FOR FAILURE TO ACCOMMODATE UNDER THE AMERICANS WITH DISABILITIES ACT**
**(Against Defendant City of New York)**

91. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

92. Plaintiff requested reasonable accommodations for his disabilities, including reassignment to a Staten Island work location or another effective accommodation that would reduce medically harmful commuting and provide reliable access to restroom facilities.

93. Defendant failed to provide a timely and effective reasonable accommodation and failed to engage in a good-faith interactive process. Defendant's belated offer of a position did not cure the harm caused by the prior delay, denials, unpaid leave, threatened termination, and disruption of Plaintiff's employment.

**AS A THIRD CAUSE OF ACTION FOR RETALIATION**
**UNDER THE AMERICANS WITH DISABILITIES ACT**
**(Against Defendant City of New York)**

94. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

95. The ADA prohibits retaliation, interference, coercion, or intimidation.

96. 42 U.S.C. § 12203 provides

> a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
>
> b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

97. Defendant violated this section as set forth herein by retaliating, and otherwise discriminating against Plaintiff because he opposed Collective Defendants' unlawful employment actions and because he requested and/or needed a reasonable accommodation.

**AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION AND FAILURE TO ACCOMMODATE**
**UNDER THE NEW YORK STATE EXECUTIVE LAW**
**(Against Defendant City of New York)**

98. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said

paragraph was more fully set forth herein at length.

99. New York State Executive Law § 296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer . . . because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, **disability**, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

100. Collective Defendants engaged in an unlawful discriminatory practice in violation of the cited section herein by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of his actual and/or perceived disability **(Atrial Septal Defect, Ulcerative Colitis, and Rheumatoid Arthritis)**.

101. Plaintiff requested reasonable accommodations, including reassignment to Staten Island or another effective accommodation addressing his medically documented commute and restroom-access limitations. Defendant failed to provide a timely and effective accommodation and failed to engage in a good-faith interactive process.

**AS A FIFTH CAUSE OF ACTION FOR RETALIATION UNDER THE NEW YORK STATE EXECUTIVE LAW**
**(Against Defendant City of New York)**

102. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

103. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

104. Defendant engaged in an unlawful discriminatory practice by retaliating, and otherwise

discriminating against Plaintiff because of Plaintiff's engagement in an activity protected under this law.

**AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE NEW YORK STATE EXECUTIVE LAW**
**(Against Individual Defendants)**

105. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

106. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any acts forbidden under this article, or attempt to do so."

107. Individual Defendants engaged in an unlawful discriminatory practice in violation of the cited section herein by aiding, abetting, inciting, compelling, and coercing the discriminatory and retaliatory conduct complained of herein.

**AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Against Defendant City of New York)**

108. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

109. New York City Administrative Code § 8-107(1) provides:

> "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived … disability… of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

110. Defendant engaged in an unlawful discriminatory practice in violation of the cited section herein by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff on the basis of his actual and/or perceived disability,

together with failure to engage in the cooperative dialogue, and failure to provide a reasonable accommodation.

**AS AN EIGHTH CAUSE OF ACTION FOR RETALIATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Against Defendant City of New York)**

111. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

112. New York City Administrative Code § 8-107(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter …"

113. Defendant engaged in an unlawful and retaliatory practice by retaliating, and otherwise discriminating against the Plaintiff because he opposed Collective Defendants' unlawful employment actions and because he requested and/or needed a reasonable accommodation.

**AS A NINTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Against Individual Defendants)**

114. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

115. New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

116. Individual Defendants engaged in an unlawful discriminatory practice in violation of the cited section herein by aiding, abetting, inciting, compelling, and coercing the above

discriminatory, unlawful, and retaliatory conduct.

**AS A TENTH CAUSE OF ACTION FOR FAILURE TO PROVIDE A REASONABLE ACCOMODATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

117. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

118. New York City Administrative Code § 8-107(15)(a) provides that it is an unlawful discriminatory practice: ". . . for any person prohibited by the provisions of this section from discriminating on the basis of disability not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."

119. Collective Defendants engaged in an unlawful discriminatory practice in violation of the cited section herein by failing to provide Plaintiff with a reasonable accommodation, and by failing to engage in the cooperative dialogue.

**AS AN ELEVENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE VICARIOUS EMPLOYER LIABILITY**
**(Against Defendant City of New York)**

120. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

121. New York City Administrative Code § 8-107(13) provides employer liability for discriminatory conduct committed by an employee, agent, or independent contractor.

a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of

this section only where:

i. the employee or agent exercised managerial or supervisory responsibility; or

ii. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct here that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

iii. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

122. Defendant City of New York violated the section cited herein.

123. Individual Defendants subjected Plaintiff to discriminatory and retaliatory conduct as alleged above.

124. Defendant City of New York was aware and/or should have been aware that Plaintiff was subjected to unlawful discrimination, retaliation, and a hostile work environment by Individual Defendants, who were acting within the scope of their authority as District Supervisors for NYC DOT, as outlined above.

125. Defendant City of New York did nothing to assist Plaintiff and/or investigate or abate the hostile work environment before actual notice of the discrimination and harassment.

126. Individual Defendants would not have been able to take their respective actions against Plaintiff but for their employment and management positions at NYC DOT.

127. Defendant City of New York are therefore vicariously liable for the discrimination,

retaliation, and hostile work environment experienced by Plaintiff.

128. As a result of the acts and conduct complained of herein, Plaintiff has suffered the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## JURY DEMAND

129. Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by the ADA, NYSHRL, and NYCHRL, in that Defendants discriminated, and retaliated against Plaintiff on the basis of his disability/disabilities, whether actual and/or perceived;

B. Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain and suffering, and injury to his reputation in an amount to be proven;

C. Awarding Plaintiff punitive damages;

D. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

E. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
September 24, 2026

**PHILLIPS & ASSOCIATES,**
**Attorneys at Law, PLLC**

By: ______________________
Melissa Vo, Esq.
*Attorneys for Plaintiff*
45 Broadway, 28th Floor
New York, New York 10006
T: (212) 248-7431
F: (212) 901-2107
mvo@tpglaws.com